## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

THOMAS WEINER, individually
and on behalf of similarly situated
individuals,

      Plaintiff,

v.

FCA US LLC, a Delaware limited
liability company,

      Defendant.

No.


**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION.......................................................................1

II.  JURISDICTION AND VENUE.................................................................2

III. PARTIES ..................................................................................................3

IV.  FACTUAL BACKGROUND ...................................................................4

V.   FACTUAL ALLEGATIONS WITH RESPECT TO PLAINTIFF .............26

VI.  CLASS ACTION ALLEGATIONS .........................................................31

COUNT I  BREACH OF WRITTEN WARRANTIES UNDER THE
    MAGNUSON-MOSS WARRANTY ACT,  15 U.S.C. § 2301, *ET SEQ.* (ON
    BEHALF OF PLAINTIFF AND THE PROPOSED CLASS AND
    SUBCLASS)...........................................................................................36

COUNT II  BREACH OF IMPLIED WARRANTIES UNDER THE
    MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *ET SEQ.* (ON
    BEHALF OF PLAINTIFF AND THE PROPOSED CLASS AND
    SUBCLASS)...........................................................................................42

COUNT III  BREACH OF EXPRESS WARRANTIES (ON BEHALF OF
    PLAINTIFF AND THE PROPOSED CLASS AND SUBCLASS)............46

COUNT IV  BREACH OF IMPLIED WARRANTY (ON BEHALF OF
    PLAINTIFF AND THE PROPOSED CLASS AND SUBCLASS)............51

COUNT V  FRAUDULENT CONCEALMENT (ON BEHALF OF PLAINTIFF
    AND THE PROPOSED CLASS AND SUBCLASS) ................................54

COUNT VI  VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
    DECEPTIVE BUSINESS PRACTICES ACT 815 ILCS 505/2 (ON
    BEHALF OF PLAINTIFF AND THE PROPOSED SUBCLASS) ............57

PRAYER FOR RELIEF......................................................................................63

JURY DEMAND ...............................................................................................64

Plaintiff, Thomas Weiner ("Plaintiff"), by and through his attorneys, brings this Class Action Complaint on behalf of himself and other consumers who purchased or leased any vehicle equipped with a 2.4L Tigershark MultiAir II Engine ("Class Vehicles") manufactured and sold by Defendant, FCA US LLC ("Defendant"). The Class Vehicles suffer from a serious defect in their engines' manufacturing, design and/or assembly, causing the engines (and thus, the vehicles themselves) to stall without warning, thereby impeding the normal operation of the vehicles and posing a severe safety risk not only to their drivers, but other drivers on America's roads. Plaintiff, on behalf of himself and a class of similarly situated individuals, seeks damages and all other available relief for Defendant's wrongful conduct. Plaintiff alleges as follows based on personal knowledge as to his own experiences, and as to all other matters, upon information and belief, including an investigation conducted by his attorneys.

## I.    NATURE OF THE ACTION

1.    This case concerns Defendant's manufacturing and sale of vehicles containing a dangerous operational defect: Defendant's 2.4L Tigershark engines consume engine oil at a furious pace and at a much more accelerated rate than Defendant discloses and warrants (the "Oil Consumption Defect"). This defect results in critically low engine oil levels, and causes vehicles installed with Defendant's 2.4L Tigershark engines to stall and lose power without warning.

2.     Like the other members of the putative Class, Plaintiff purchased one of the Class Vehicles, a 2018 Jeep Compass, containing the Oil Consumption Defect. After driving his vehicle for less than two years, and for fewer than 25,000 miles, Plaintiff's 2018 Jeep Compass has stalled multiple times while Plaintiff was operating the vehicle normally, causing him to lose the ability to control his vehicle and exposing him to the risk of collision and catastrophic injury. Consumers nationwide who own many of Defendant's models have complained of the exact same vehicle stalling, safety risks, and accelerated oil consumption, but Defendant has failed to implement a recall, remedy the Oil Consumption Defect, provide adequate repairs, or take appropriate action to protect its customers and other drivers from the danger of vehicles suddenly losing power on the nation's roadways.

3.     As a result of Defendant's wrongful conduct as described herein, owners and lessees of vehicles installed with Defendant's 2.4L Tigershark engines have suffered damages, including, *inter alia*, for (1) overpayment for their vehicles, (2) out-of-pocket expenses for increased engine oil purchases, (3) increased service visits, (4) costs for future repairs and/or replacements, and/or (5) diminished value of their vehicles.

## II.     JURISDICTION AND VENUE

4.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(d), because (i) at least one member of the putative class is a citizen of a state different

from the Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to the instant action.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendant is headquartered in this District, Defendant has marketed, advertised, sold and leased the Class Vehicles within this District, and many of the acts and transactions giving rise to this action occurred in this District, including FCA's design,  manufacturing, promotion, marketing, distribution, and sale of the Class Vehicles. Further, a significant number of the Class Vehicles are registered in this District and thousands of Class Vehicles are in operation in this District.

### III.   PARTIES

6.      Plaintiff Thomas Weiner is a citizen and resident of the State of Illinois.

7.      Defendant FCA US LLC is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. Defendant designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, throughout the United States, including in this District. Defendant is the warrantor and distributor and/or seller of the Class Vehicles in the United States.

## IV.   FACTUAL BACKGROUND

8.     Defendant's Jeep Compass model is a popular compact sport utility vehicle sold throughout the United States and its territories, with more than 170,000 sold in 2018 alone.

9.     Defendant advertises in its 2018 Jeep Compass marketing brochure that the 2018 model contains a 2.4L Tigershark engine that "incorporates a column of oil flow with precise control of intake valve events. This I-4 burns clean, improves fuel efficiency and reduces emissions with a *quiet and refined* ride."



10.     As with all passenger vehicles, Defendant's 2.4L Tigershark engines require adequate engine oil to operate. Engine oil functions as an essential lubricant for the moving parts in internal combustion engines, decreasing heat and reducing wear.

11.     Indeed, all cars require periodic engine oil replacement. While historically the standard recommendation was to replace engine oil every 3,000

miles, most modern synthetic oils offer good engine protection for 5,000–7,500 miles.

12.     Thus, absent prior warning, no prospective car buyer expects the car they purchase to require engine oil replenishment every several hundred miles, or even every thousand miles, and no prospective car buyer expects that they will need to check their new vehicle's engine oil before each time they pull out of their driveway.

13.     In fact, on page 365 of its 2018 Jeep Compass Owner's Manual ("Owner's Manual"), Defendant advises that even under "Severe Operating Conditions," oil changes should not be necessary at less than 3,500-mile intervals:

**SCHEDULED SERVICING**

Your vehicle is equipped with an automatic oil change indicator system. The oil change indicator system will remind you that it is time to take your vehicle in for scheduled maintenance.

Based on engine operation conditions, the oil change indicator message will illuminate in the instrument cluster. This means that service is required for your vehicle. Operating conditions such as frequent short-trips, trailer tow and extremely hot or cold ambient temperatures will influence when the "Change Oil" or "Oil Change Required" message is displayed. Severe Operating Conditions can cause the change oil message to illuminate as early as 3,500 miles (5,600 km) since last reset. Have your vehicle serviced as soon as possible, within the next 500 miles (805 km).

Your authorized dealer will reset the oil change indicator message after completing the scheduled oil change. If a scheduled oil change is performed by someone other than your authorized dealer, the message can be reset by referring to the steps described under "Instrument Cluster Display" in "Getting To Know Your Instrument Panel" for further information.

**NOTE:** Under no circumstances should oil change intervals exceed 10,000 miles (16,000 km), one year or 350 hours of engine run time, whichever comes first. The 350 hours of engine run or idle time is generally only a concern for fleet customers.

**Severe Duty All Models**

Change Engine Oil at 4,000 miles (6,500 km) or 350 hours of engine run time if the vehicle is operated in a dusty and off road environment or is operated predominately at idle or only very low engine RPM's. This type of vehicle use is considered Severe Duty.

**NOTE:** The Oil Change Indicator will not illuminate under these conditions.

**Once A Month Or Before A Long Trip:**

- Check engine oil level.
- Check windshield washer fluid level.
- Check the tire inflation pressures and look for unusual wear or damage.
- Check the fluid levels of the coolant reservoir, and brake master cylinder reservoir, and fill as needed.
- Check function of all interior and exterior lights.

14.     Page 370 of Defendant's Owner's Manual tells 2018 Jeep Compass owners to check their oil engine oils at regular intervals, such as once per month. Page 231 of Defendant's Owner's Manual states that "oil changes should be consistent with anticipated climate conditions under which vehicle operations will occur."

15.     Additionally, the Owner's Manual directs 2018 Jeep Compass owners to "Maintain the oil level between the range markings on the dipstick. The safe range is indicated by a crosshatch zone. Adding 1 quart (0.9 Liters) of oil when the reading is at the low end of the indicated range will result in the oil level at the full end of the indicator range." Thus, Defendant advises 2018 Jeep Compass owners that 1 quart of oil is the approximate difference between inadequate and adequate engine oil levels.

16.     Finally, Defendant's Owner's Manual states that the 2018 Jeep Compass features two different engine oil level monitoring alerts: an Oil Pressure Warning Light and an engine oil change indicator.

17.     Page 121 of the Owner's Manual informs 2018 Jeep Compass owners that their Oil Pressure Warning Light "will illuminate to indicate low engine oil pressure. If the light turns on while driving, stop the vehicle and shut off the engine as soon as possible. A chime will sound when this light turns on":

**✌ — Oil Pressure Warning Light**

This warning light will illuminate to indicate low engine oil pressure. If the light turns on while driving, stop the vehicle and shut off the engine as soon as possible. A chime will sound when this light turns on.

Do not operate the vehicle until the cause is corrected. This light does not indicate how much oil is in the engine. The engine oil level must be checked under the hood.

18.     Page 107 of the Owner's Manual informs 2018 Jeep Compass owners that their "engine oil change indicator system" will display an "Oil Change Due" message to warn its owner an oil change is needed:

**Oil Change Reset**

- Your vehicle is equipped with an engine oil change indicator system. The "Oil Change Due" message will display in the instrument cluster display for five seconds after a single chime has sounded, to indicate the next scheduled oil change interval. The engine oil change indicator system is duty cycle based, which means the engine oil change interval may fluctuate, dependent upon your personal driving style.

- Unless reset, this message will continue to display each time the ignition is cycled to the ON/RUN position.

- To reset the oil change indicator after performing the scheduled maintenance, refer to the following procedure.

19.     However, due to the Oil Consumption Defect, Defendant's 2018 Jeep Compass engines burn engine oil at an accelerated rate, much faster than it tells its owners or that its owners would expect. The Oil Consumption Defect not only forces 2018 Jeep Compass owners to refill their car's engine oil constantly—due to

- 7 -

unanticipated low engine oil levels, their vehicles also frequently stall without warning from the vehicles' engine oil monitoring systems.

20.     Defendant has been aware of the fact that its 2.4L Tigershark engines consume excessive engine oil since, at the latest, July 31, 2015, when it issued Technical Service Bulletin 09-007-15 to its authorized dealerships:



**NUMBER:** 09-007-15

**GROUP:** Engine

**DATE:** July 31, 2015

*This bulletin is supplied as technical information only and is not an authorization for repair. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, or otherwise, without written permission of FCA US LLC.*

**THIS BULLETIN SUPERSEDES SERVICE BULLETIN 09-001-12, DATED JUNE 27, 2012, WHICH SHOULD BE REMOVED FROM YOUR FILES. ALL REVISIONS ARE HIGHLIGHTED WITH \*\*ASTERISKS\*\* AND INCLUDES UPDATES TO MODELS AND OIL CONSUMPTION.**

**SUBJECT:**
Engine Oil Consumption Guideline

**\*\*MODELS: This bulletin applies to all 2012-2016 FCA US LLC vehicles equipped with gasoline engines.\*\***

**DISCUSSION:**
Engines require oil to lubricate and protect the load bearing and internal moving parts from wear including cylinder walls, pistons and piston rings. When a piston moves down its cylinder, a thin film of oil is left on the cylinder wall. During the power stroke, part of this oil layer is consumed in the combustion process. Varying rates of oil consumption are accepted as normal in all engines.

**Oil Consumption**
\*\*The accepted rate of oil consumption for engines used in the vehicles listed above is 1 quart (0.946 liter) in 2,000 miles (3,200 km) for the 1st 50,000 miles (80,467 km). For vehicles with more then 50,000 miles (80,467 km) the acceptable oil consumption for engines is 1 quart (0.946 liter) in 750 miles (1,207 km).\*\*

21.     The same 2.4L Tigershark engine installed in Defendant's 2018 Jeep Compass vehicles was installed in several of Defendant's 2012-2016 models, but

Defendant failed to notify prospective 2018 Compass purchasers that the 2.4L Tigershark engine requires engine oil replenishment every 2,000 miles, which is more frequent than normal.

22.    In reality, Defendant's Compass engines consume engine oil at an even faster rate than 1 quart per 2,000 miles. Complaints made to the National Highway Traffic Safety Administration's ("NHTSA") show that 2018 Compass owners nationwide experiencing the Oil Consumption Defect have been told by Defendant's dealerships that their Compass engines require oil changes every 1,000 or even 750 miles. Unaware that their Compass engines require such frequent oil replenishment, Compass owners have had their vehicles' engine stall, their vehicles' parking brakes have engaged, and they have lost all control of their vehicles due to critically low engine oil levels:[1]

---

[1] https://www.nhtsa.gov/vehicle/2018/JEEP/COMPASS/SUV/AWD#complaints.

**NHTSA ID Number:** 11231624

**Incident Date** July 1, 2019

**Consumer Location** SHERWOOD, OR

**Vehicle Identification Number** 3C4NJDAB6JT****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | I WAS DRIVING MY VEHICLE ON A CITY STREET AT 45 MILES |
| FIRE | No | AN HOUR WHEN THE ENGINE TURNED OFF WITH NO |
| INJURIES | 0 | WARNING. THE STEERING WHEEL LOCKED UP WHEN THE |
| DEATHS | 0 | VEHICLE TURNED OFF AND COASTED THE PARKING BREAK |

ENGAGED AT 15 MILES AN HOUR FORCING ME TO HARD
BREAK AND ALMOST GET REAR ENDED WITH CHILDREN IN
THE VEHICLE. I HAD MY VEHICLE TOWED TO THE DEALERSHIP
WHERE IT WAS PURCHASED. THEY TOLD ME IT WAS A SAFETY
FEATURE FOR THE JEEP FOR THE ENGINE TO SHUT OFF WHEN
THE OIL IS LOW. THE DEALERSHIP IS CLAIMING THAT ITS
WITH IN CHRYSLERS SPECS THAT THIS ENGINE (2.4 MULTI-AIR
9 SPEED) CAN BURN 1 QUART OF OIL EVERY THOUSAND
MILES. THIS JEEP ONLY HAS 3,043 MILE ON IT. IT IS A SERIOUS
SAFETY ISSUE FOR ENGINES TO SHUT OFF WHILE THE
VEHICLE IS IN MOTION. THIS NEEDS TO BE FIXED IT CAN
CAUSE SERIOUS HARM AND POSSIBLE DEATH IN A COLLISION.
BOTH OF THE JEEP DEALERSHIP AND CHRYSLER REFUSED TO
REMEDY THE SITUATION. THEY ARE FORCING ME TO DRIVE
THE VEHICLE FOR AN OIL CONSUMPTION TEST REGARDLESS
OF THE SAFETY ISSUES. *DT

**NHTSA ID Number:** 11222005

**Incident Date** June 21, 2019

**Consumer Location** DOBBS FERRY, NY

**Vehicle Identification Number** 3C4NJDCB8JT****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | JEEP COMPASS 2018 MILEAGE 5188 - ON FRIDAY, JUNE 21, |
| FIRE | No | 2019 I WAS JUST LEAVING MY HOME TO GO TO WORK AT 7:45 |
| INJURIES | 0 | AM AND I WAS ABOUT 1.5 MILES FROM MY HOME WHEN MY |
| DEATHS | 0 | CAR JUST CEASED ON A MAJOR ROADWAY AND THE |

DASHBOARD SAID OIL PRESSURE LOW. I HAD OTHER CARS
BEHIND ME AND WAS VERY LUCKY NO ONE HAD HIT ME FROM
BEHIND AND I DID NOT GET SERIOUSLY HURT. I IMMEDIATELY
CALLED DEALER HEALY CHRYSLER JEEP WHERE I BOUGHT MY
CAR AND SPOKE TO A SERVICE MANAGER NAMED JEFF
ROSCINO AND HE TOLD ME THAT I SHOULD TAKE THE CAR TO
THE NEAREST DEALER TO ME AND HAVE MY OIL CHANGED.
HE TOLD ME THAT THIS CAR'S MOTOR WAS INTRINSICALLY
DESIGNED TO BURN THIS AMOUNT OF OIL.

I HAD BROUGHT THE CAR TO YONKERS CHRYSLER JEEP
WHICH WAS NEAREST DEALER TO ME AND THEY DID AN OIL
CHANGE - SYNTHETIC OIL PUT 6 QUARTS OF OIL IN CAR - THE
SERVICE ADVISOR SAID THERE WAS A VERY LITTLE AMOUNT
OF OIL IN CAR.

**NHTSA ID Number:** 11181723

**Incident Date** February 9, 2019

**Consumer Location** NOBLE, OK

**Vehicle Identification Number** 3C4NJDAB6JT****

### Summary of Complaint

| | | |
|---|---|---|
| CRASH | No | I'VE OWNED A 2018 JEEP COMPASS FOR 2 MONTHS I BOUGHT IT WITH LESS THAN 50 MILES ON IT. AT 3500 MILES THE ENGINE WILL SHUT OFF RANDOMLY. YOU HAVE TO PUT THE JEEP IN PARK TO RESTART THE CAR. THE CAUSE OF THIS IS THE JEEP CONSUMES OIL AG A RATE OF A QUART PER 1000 MILES AND THE JEEP IS INSTALLED WITH A FAIL SAFE THAT KILLS THE MOTOR SO IT DOESN'T HARM THE MOTOR BUT WILL LEAVE YOU STOPPED IN THE MIDDLE OF THE HIGHWAY. THE ONLY WAY TO RESTART THE CAR IS TO PUT IT IN PARK AND RESTART IT.THERE IS NO LOW OIL WARNINGS OR OIL CHANGE INDICATORS. THE RECOMMENDED OIL CHANGE IS 5000 MILES |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11221045

**Incident Date** June 18, 2019

**Consumer Location** LOS ANGELES, CA

**Vehicle Identification Number** 3C4NJCBBXJT****

### Summary of Complaint

| | | |
|---|---|---|
| CRASH | No | THIS HAPPENED THREE TIMES OVER THE PAST TWO WEEKS. I HAVE BEEN DRIVING MY CAR IN HEAVY TRAFFIC AND CAR WILL THROW ITSELF IN EMERGENCY BRAKE MODE AND ENGINE WILL TURN OFF. LOSS OF STEERING CONTROL IS GONE AS WELL. HAVE BEEN EXTREMELY LUCKY TO NOT GET IN AN ACCIDENT. DROPPED CAR OFF TO DEALER WHO BLAMED IT ON "LOW OIL." DUE TO "LOW OIL" LEVELS HOWEVER CAR IS ONLY 7 MONTHS OLD AND JUST 4K MILES. HE RECOMMENDED I CHANGE THE OIL EVERY 750 MILES! 750! A STANDARD CAR IS EVERY 5,000 MILES. THE FACT THAT MY OIL CHANGE COULD BE THE DETERMINING FACTOR BETWEEN MY ENGINE TURNING OFF MID DRIVE AND GETTING IN AN ACCIDENT IS ABSURD. WHILE RESEARCHING THERE ARE HUNDREDS OF SIMILAR CASES WITH THE SAME CAR. PEOPLE HAVE GOTTEN IN ACCIDENTS DUE TO THE CAR STALLING ON HIGHWAYS AND INTERSECTIONS. NOT SAFE TO DRIVE. DO NOT RECOMMEND. LEGITIMATELY SCARED TO DRIVE. SHOULD NOT BE ALLOWED ON THE ROAD! |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11205766

**Incident Date** April 2, 2019

**Consumer Location** DOWNINGTOWN, PA

**Vehicle Identification Number** 3C4NJDBB7JT****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | I WAS DRIVING 44MPH HEADED TO A RED LIGHT WITH A 4 LANE HIGHWAY COMING THE OTHER DIRECTION. THE JEEP SHUT OFF WHILE I WAS GOING 44MPH AND I HAD NO STEERING, NO BREAKS, NO POWER AT ALL. I KEPT HITTING RESTART AND FINALLY THE ENGINE KICKED BACK ON, I WAS ABLE TO GET THE CAR TO THE SIDE OF THE ROAD. VEHICLE WAS TOWED TO THE DEALERSHIP D'AMBROSIO IN DOWNINGTOWN, PA. WHEN JEEP SHUT OFF WARNING LIGHTS CAME ON SAYING "LOW OIL PRESSURE". NO LIGHTS APPEARED PRIOR TO JEEP SHUTTING OFF WHILE GOING 44MPH. I ALMOST DIED! WHILE AT DEALERSHIP I WAS TOLD BY SERVICE MANAGER THAT THE PARTS GUY'S WIFE HAD THE SAME THING HAPPEN TO HER WHILE DRIVING HER JEEP JUST STOPPED ON THE HIGHWAY. EASTER SUNDAY MY BROTHER TOLD ME HIS FRIEND CALLED HIM AND TOLD HIM THAT HIS WIFE'S JEEP SHUT OFF WHILE SHE WAS DRIVING ON A HIGHWAY. THERE IS A SERIOUS ISSUE WITH THESE VEHICLES. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11218961

**Incident Date** March 6, 2019

**Consumer Location** BEL AIR, MD

**Vehicle Identification Number** N/A

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | BOUGHT BRAND NEW. WITH 4700 MILES PUT ON IT, IT HAD LOST OIL AND STALLED SEVERAL TIMES. MY WIFE WAS DRIVING. WE TOOK IT STRAIGHT TO THE DEALERSHIP WHERE WE BOUGHT IT. COME TO FIND OUT, IT BURNS OIL AT AN ACCELERATED RATE. MANY VEHICLES WITH THIS MOTOR, 2.4L MULTIAIR, ARE HAVING THIS PROBLEM. ENGINES ARE HAVING TO BE REPLACED, WHEN THEY ARE STILL NEW. WHEN RUNNING LOW ON OIL, THE VEHICLE SUDDENLY SHUTS DOWN WITH NO WARNING, LIGHTS, INDICATING ITS OUT OF OIL AND THAT COULD BE VERY DANGEROUS. IF ON A HIGHWAY OR WHEREVER THERE IS HEAVY TRAFFIC. DEFINITELY SEE A BAD ACCIDENT HAPPENING. A NEW CAR SHOULD NOT BE BURNING OIL AT AN EXCESSIVE RATE. PLEASE LOOK INTO THIS.JEEP/FCA SEEM LIKE NOTHING IS BEING DONE ABOUT THIS. I CALLED JEEP RIGHT BEFORE WRITING THIS, AND THE CUSTOMER SERVICE REP HASN'T HEARD ABOUT IT. THE DEALERSHIP WHERE I GOT IT HAS REPLACED 15 OF THESE MOTORS ALREADY. THANKYOU |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11203404

**Incident Date** April 24, 2019

**Consumer Location** CHICAGO, IL

**Vehicle Identification Number** 3C4NJDAB7JT****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | AFTER STARTING CAR AND DRIVING EMERGENCY BREAK ENGAGES AND CAR SHUTS OFF WHILE IN MOTION. UPON TURNING OFF, "LOW OIL PRESSURE" WARNING COMES UP FOR LESS THAN 3 SECONDS AND THEN DISAPPEARS.. AND ENGINE STAYS OFF. TAKES ABOUT 5-7 MINUTES FOR CAR TO TURN BACK ON. THIS HAS OCCURRED MULTIPLE TIMES WHILE DRIVING ON INTERSTATE HIGHWAY AND BUSY INTERSECTION. SUPER DANGEROUS AND NOT SAFE... HAVE CALLED JEEP TO OPEN A CASE AND TAKING IN FOR SERVICING. THIS IS NOT OK. TRUCK IS LESS THAN 6 MONTHS, NOT EVEN 3,000 MILES. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11197229

**Incident Date** April 1, 2019

**Consumer Location** ROSEVILLE, MI

**Vehicle Identification Number** N/A

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | I LEASED A 2018 JEEP COMPASS LIMITED 4X4 - WAS DRIVING WENT TO ONTO A SIDE STREET FROM A BUSY MAIN STREET , MY JEEP STALLED AND THE LOW OIL PRESSURE LIGHT CAME ON FOR A SPLIT SECOND , AS I COSTED OFF TO THE SIDE OF THE ROAD - MY VEHICLE WOULD NOT RESTART RIGHT AWAY - IT TOOK A MINUTE TO RESTART - THE VEHICLE IS ONLY 6 MONTHS OLD AND ONLY HAS 5095 MILE ON IT - I TOOK IT TO THE DEALERSHIP AND THE SERVICE GUY STATED THAT THE ENGINE IS KNOWN FOR" BURNING OIL " OR USING MORE THAN USUAL AND THERE WOULD NEED TO BE A CASE STARTED ON THIS TO SEE IF THE VEHICLE WILL BE REPAIRED . THIS IS NOT ACCEPTABLE TO ME THIS IS A BRAND NEW CAR - THERE SHOULD NOT BE ANY ISSUES . THE COMPANY SHOULD STAND BEHIND THE CUSTOMER - NOT MAKE THEM TAKE THE PRODUCT BACK AND FOURTH 3 OR 4 TIMES BEFORE THEY WILL DO ANYTHING |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11196913

**Incident Date** April 12, 2019

**Consumer Location** SCOTTSDALE, AZ

**Vehicle Identification Number** 3C4NJCCB7JT****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | AT 4,000 MILES, STALLED THREE TIMES, THREE DAYS IN A ROW. TOOK IT IN & THEY SAID THE ENGINE IS BURNING OFF OIL TOO QUICKLY. NO LIGHTS CAME ON, JUST KEPT STALLING. *DT |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | CONSUMER STATED ENGINE STOPPED RUNNING.*JB |

**NHTSA ID Number:** 11192405

**Incident Date** December 12, 2018

**Consumer Location** CRYSTAL LAKE, IL

**Vehicle Identification Number** 3C4NJDBB0JT****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2018 JEEP COMPASS. THE CONTACT STATED THAT THE VEHICLE STALLED WHILE DRIVING. THE CONTACT WAITED A FEW SECONDS, RESTARTED THE ENGINE, AND WAS ABLE TO CONTINUE DRIVING. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO CRYSTAL LAKE JEEP DODGE CHRYSLER RAM (5404 S ILLINOIS RTE 31, CRYSTAL LAKE, IL 60012, (815) 459-9000) WHERE IT WAS DIAGNOSED THAT AN OIL CHANGE WAS NEEDED. THE VEHICLE WAS REPAIRED; HOWEVER, THE CONTACT STATED THAT A QUART OF OIL HAD BEEN BURNED OFF SINCE THE REPAIR. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE MANUFACTURER STATED THAT THE BURNING OF A LARGE AMOUNT OF OIL WAS NORMAL FOR THE VEHICLE. THE FAILURE MILEAGE WAS 8,300. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

- 14 -

**NHTSA ID Number:** 11191081

**Incident Date** March 18, 2019

**Consumer Location** WALDORF, MD

**Vehicle Identification Number** 3C4NJCBB2JT****

### Summary of Complaint

| | | |
|---|---|---|
| CRASH | No | I WAS MAKING A RIGHT HAND TURN INTO TRAFFIC ON A BUSY HIGHWAY WHEN MY BRAND NEW 2018 JEEP COMPASS STALLED OUT. I HAD TO QUICKLY DRIFT TO SAFETY AND PUT ON MY HAZARD LIGHTS AND TRY TO START THE CAR AGAIN. I TOOK ABOUT A MINUTE TO START AGAIN. AFTER THAT IT HAPPENED SEVERAL MORE TIMES ALL WHEN I WAS IN THE MIDDLE OF DRIVING. I CALLED THE DEALER AND WAS TOLD THAT IT USUALLY MEANS IT NEEDS AN OIL CHANGE. I HAD THE CAR FOR 3 MONTHS AND WAS TOLD I SHOULD CHECK THE OIL EVERY 500 TO 1000 MILES EVEN THOUGH THE CAR TAKES OIL AND SHOULD BE GOOD FOR ABOUT 5,000 MILES. NEVER ONCE DID I RECEIVE ANY WARNING LIGHTS. I FEAR FOR MY SAFETY WHEN DRIVING THIS VEHICLES. *DT *DT*JB |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11268004

**Incident Date** November 10, 2018

**Consumer Location** GILROY, CA

**Vehicle Identification Number** 3C4NJCAB5JT****

### Summary of Complaint

| | | |
|---|---|---|
| CRASH | No | TL- THE CONTACT OWNS A 2018 JEEP COMPASS. THE CONTACT STATED THAT WHILE DRIVING AT 35 MPH, THE VEHICLE SHUT OFF WITHOUT WARNING. THE CONTACT STATED THAT THE EMERGENCY BRAKES TURN ON INDEPENDENTLY AS THE VEHICLE UNEXPECTEDLY SHUT OFF. ON ANOTHER OCCASION, THE CONTACT'S WIFE WAS DRIVING ON THE HIGHWAY(SPEED UNKNOWN), AND THE FAILURE OCCURRED AGAIN AND A LOW OIL PRESSURE WARNING LIGHT ILLUMINATED. THE CONTACT TOOK THE VEHICLE TO SOUTH COUNTY CHRYSLER DODGE JEEP RAM 455 AUTOMALL DR, GILROY, CA 95020 408-842-8244 WHERE THEY INFORMED THE CONTACT THAT THIS WAS A NORMAL ISSUE WITH THE VEHICLE AND TO CHECK THE OIL FREQUENTLY. THE FAILURE PERSISTED AND THE SAME DEALER GAVE THE CONTACT'S WIFE THE SAME INFORMATION AGAIN. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND REFERRED HIM TO NHTSA. THE VEHICLE HAD NOT BEEN REPAIRED. THE FAILURE MILEAGE WAS 7,708. JO |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

- 15 -

**NHTSA ID Number:** 11195822

**Incident Date** April 8, 2019

**Consumer Location** FRAMINGHAM, MA

**Vehicle Identification Number** 3C4NJDBB1JT****

**Summary of Complaint**

| | |
|---|---|
| CRASH | No |
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

OVER THE PAST WEEK, I HAVE HAD ABOUT 10 INSTANCES WHERE MY NEW (6 MONTH OLD - ~5K MILE) JEEP COMPASS DIED IN THE MIDDLE OF DRIVING. I WAS UNABLE TO ACCELERATE, MOVE, OR ANYTHING. THE ONLY ACTION I COULD DO WAS TO BRAKE. DURING A HANDFUL OF THESE INSTANCES, I WAS IN A PARKING GARAGE, GAS STATION OR ON A SIDE STREET WHERE I WAS ABLE TO SAFELY PULL OVER AND FIGURE OUT HOW TO RESOLVE THE ISSUE. THE OTHER TIMES, I WAS DRIVING TO/FROM WORK IN THE CITY OF BOSTON. THESE EVENTS WERE EXTREMELY TERRIFYING AND THERE WAS NOTHING I COULD HAVE DONE WITHOUT WARNING TO PREVENT BEING STUCK IMMOBILE IN THESE INTERSECTIONS.

WHEN THIS HAPPENS, I HAVE TO PUT THE CAR IN PARK, REMOVE THE PARKING BRAKE (WHICH AUTOMATICALLY TURNS ON WHILE DRIVING), THEN SHUT OFF THE CAR, THEN TURN ON THE CAR AGAIN (WHERE THE ENGINE TURNS OVER A FEW TIMES FIRST), THEN IT'S "GOOD" TO DRIVE AGAIN.

I TOOK THE CAR TO MY JEEP DEALER (WHERE I PURCHASED THE VEHICLE) TO HAVE THE ISSUE INSPECTED/OIL CHANGED. AS A RESULT, THEY CONCLUDED THAT THE ENGINE ON MY JEEP HAS AN UNRESOLVABLE ISSUE FROM THE MANUFACTURER WHERE THE ENGINE BURNS OIL MORE THAN ADVERTISED, UNLIKE THE 2016 VERSION OF THIS VEHICLE.THEY CONFIRM THAT NO MESSAGE OR ENGINE LIGHT CODE APPEARED, AND THE ONLY WAY TO PREVENT THIS WOULD BE TO CHECK THE OIL CONSTANTLY. THEY SHOWED A PRINT OUT FROM THEIR SYSTEM THAT STATED MY CAR HAS 5 QUARTS OF OIL, AND EACH 1 QUART OF OIL SHOULD LAST ~5K MILES. THEREFORE, THE OIL SHOULD NOT BE LOW ENOUGH TO STALL AN ENGINE @ 6 MONTHS/5K MILES.

THIS IS ABSOLUTELY NOT ACCEPTABLE IN A NEW VEHICLE. I HAVE NO INDICATION WHEN A PROBLEM EXISTS. IF I RECEIVED SOME SORT OF WARNING/DASHLIGHT (REALLY ANYTHING), I WOULD KNOW THE CAR IS NOT SAFE TO DRIVE UNTIL AN ISSUE IS ADDRESSED. HOWEVER, THIS DOES NOT HAPPEN, SO I HAVE TO MANUALLY CHECK THE OIL WHEN I HAVE NO EXPERTISE IN DOING SO IN ORDER TO IDENTIFY THE ISSUE.

**NHTSA ID Number:** 11193985

**Incident Date** April 4, 2019

**Consumer Location** NEWARK, DE

**Vehicle Identification Number** 3C4NJDBBXJT****

**Summary of Complaint**

| CRASH | No | CAR IS BURNING THROUGH OIL TOO FAST. IT HAS STALLED ON ME (WITHOUT WARNING) 5 OR 6 TIMES IN THE PAST 8 MONTHS DUE TO LOW OIL. TOOK TO DEALER TWICE AND WAS TOLD TO JUST GET AN OIL CHANGE-THEY REFUSE TO CHECK ANYTHING ELSE AND THAT THIS IS TYPICAL OF THE COMPASS. I SHOULD NOT HAVE TO SPEND THE MONEY TO GET FREQUENT OIL CHANGES ON A CAR USING SYNTHETIC OIL. I DO NOT FEEL SAFE DRIVING IN A VEHICLE THAT COULD SHUT OFF AT ANYTIME WITHOUT WARNING. THIS HAPPENED AT 8100 MILES. |
|---|---|---|
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11266769

**Incident Date** October 5, 2019

**Consumer Location** COUNCIL BLUFFS, IA

**Vehicle Identification Number** 3C4NJDDB4JT****

**Summary of Complaint**

| CRASH | No | MY CAR HAS STALLED OUT SEVERAL TIMES ON THE INTERSTATE AND IN BUSY IN TOWN TRAFFIC ALL DUE TO LOW OIL PRESSURE. I HAVE TAKEN MY CAR IN SEVERAL TIMES TO HAVE THE OIL TOPPED OFF BECAUSE MY DIPSTICK IS SHOWING NO OIL. THIS HAPPENS ABOUT EVERY 500 MILES. THIS CAR IS A DEATH TRAP! |
|---|---|---|
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11279790

Incident Date July 17, 2019

**Consumer Location** BONNEY LAKE, WA

**Vehicle Identification Number** 3C4NJCAB2JT****

**Summary of Complaint**

| CRASH | No |
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

I BOUGHT MY 2018 JEEP COMPASS IN FEBRUARY 2019. IN JULY 2019 WHILE DRIVING THE CAR ON THE FREEWAY WITH MY 2 DAUGHTERS THE OIL LIGHT CAME ON AND THE CAR TURNED OFF IN THE MIDDLE OF TRAFFIC. THANK GOD I WAS IN TRAFFIC AND I WAS ABLE TO RESTART THE CAR. THE OIL LIGHT DID NOT COME BACK ON AND I WAS ABLE TO DRIVE THE CAR. A FEW DAYS LATER THIS HAPPENED AGAIN WHILE TAKING MY DAUGHTERS TO VISIT FAMILY ON THE ROAD. I WAS ABLE TO START THE CAR AGAIN. THE OIL LIGHT DID NOT COME BACK ON AGAIN. THE NEXT DAY I TOOK MY CAR TO LARSON DODGE AND JEEP DEALER IN PUYALLUP, WA. I TOLD THEM WHAT WAS HAPPENING AND I WAS TOLD THAT IT IS A KNOWN PROBLEM THAT THE JEEP COMPASS HAS A PROBLEM WITH OIL EVAPORATING AND THEY WOULD CHANGE THE OIL. THE SERVICE PERSON I TALKED TO SAID HIS WIFE ALSO HAS A JEEP COMPASS AND HE IS TRYING TO CONVINCE HIS WIFE TO TRADE IT IN BECAUSE TO THIS PROBLEM. I AM NOT SURE HOW OIL CAN JUST EVAPORATE. AT THE TIME OF THE OIL CHANGE I HAD DRIVEN ABOUT 3000 TO 3500 MILES SINCE I BOUGHT THE CAR. I HAVE HAD TO HAVE MY OIL CHANGED ONE OTHER TIME AROUND 3000 MILES AND WILL HAVE TO HAVE IT CHANGED AGAIN SOON. THE LAST TIME THE OIL WAS VERY LOW AGAIN AND IT GETTING LOW AGAIN. I HAVE TO CONTINUOUSLY CHECK MY OIL ON A WEEKLY BASIS ON AN ALMOST NEW CAR. DRIVING THIS CAR, THAT CAN JUST TURN OFF AT ANYTIME DUE TO A KNOWN OIL CONSUMPTION ISSUE WITH THE 2018 JEEP COMPASS NOT ONLY PUTS ME IN DANGER BUT IT PUTS MY CHILDREN IN DANGER EACH TIME THE CAR IS DRIVEN. I DO NOT HAVE ANOTHER MODE OF TRANSPORTATION.

**NHTSA ID Number:** 11338339

Incident Date July 7, 2020

**Consumer Location** COLUMBUS, IN

**Vehicle Identification Number** 3C4NJDBB0JT****

**Summary of Complaint**

| CRASH | No |
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

MY 2018 COMPASS STALLED ON ME TWICE IN CITY TRAFFIC. CHECKED THE OIL AND THE DIP STICK WAS DRY. THE OIL LIGHT DID NOT GO ON.

23.     The posts displayed above are just a sample of the 100+ identical complaints regarding 2018 Jeep Compass excessive oil consumption listed on the NHTSA's consumer-complaint repository. Further, there are numerous other websites where 2018 Jeep Compass owners have voiced the same complaints about unanticipated and involuntary vehicle stalling without warning due to insufficient engine oil.

24.     Owners of Defendant's other models installed with the 2.4L Tigershark engine, including the 2015-2016 Chrysler 200, 2013-2016 Dodge Dart, 2016-2020 Fiat 500X, 2017-2020 Fiat Toro, 2014-2020 Jeep Cherokee, 2015-2020 Jeep Renegade, 2015-2020 Ram ProMaster City, and 2017, 2019, and 2020 model-year Jeep Compass, have made identical complaints of unexpected and involuntary engine stalling to the NHTSA:

**NHTSA ID Number:** 11308557

**Incident Date** November 1, 2017

**Consumer Location** LANCASTER, PA

**Vehicle Identification Number** 1C3CCCAB3GN****

### Summary of Complaint

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2016 CHRYSLER 200. THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS SPEEDS WITHOUT WARNING THE VEHICLE STALLED. THE CONTACT ALSO STATED THAT THE VEHICLE CONSUMED AN ABNORMAL AMOUNT OF ENGINE OIL AFTER EACH OIL CHANGE. JEFF D   AMBROSIO DODGE CHRYSLER JEEP DOWNINGTOWN 1221 E LANCASTER AVE, DOWNINGTOWN, PA 19335, WAS CONTACTED BY PHONE AND THE CONTACT WAS INFORMED THAT THE VEHICLE WAS NO LONGER UNDER WARRANTY AND THAT THE VEHICLE WOULD NOT BE DIAGNOSED UNLESS THE CHECK ENGINE WARNING LIGHT WAS ILLUMINATED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE CONTACT WAS PROVIDED SIMILAR INFORMATION AS THE DEALER. THE FAILURE MILEAGE WAS UNKNOWN. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11242097

**Incident Date** May 16, 2019

**Consumer Location** ORLANDO, FL

**Vehicle Identification Number** 1C3CDFBB6FD****

### Summary of Complaint

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2015 DODGE DART. WHILE DRIVING 55 MPH, THE VEHICLE SEIZED AND LOST POWER WITHOUT WARNING. THE VEHICLE VEERED TO THE SHOULDER OF THE ROAD. WHEN THE VEHICLE WAS TURNED OFF AND RESTARTED, IT RESUMED NORMAL OPERATION. THE VEHICLE WAS TAKEN TO GREENWAY DODGE CHRYSLER JEEP RAM (9051 E COLONIAL DR, ORLANDO, FL 32817, (407) 347-4929) WHERE IT WAS DIAGNOSED THAT THE OIL CONSUMPTION SEEMED LOW. THE OIL WAS CHANGED, BUT THE FAILURE RECURRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND PROVIDED CASE NUMBER: 59514487. THE CONTACT WAS INFORMED THAT THE VEHICLE WOULD NEED TO BE DRIVEN FOR 2,000 MILES IN ORDER TO DETERMINE IF THE ENGINE NEEDED TO BE REPLACED. THE FAILURE MILEAGE WAS APPROXIMATELY 54,000. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**NHTSA ID Number:** 11166676

**Incident Date** November 6, 2018

**Consumer Location** ABSECON, NJ

**Vehicle Identification Number** ZFBCFYDT6GP****

#### Summary of Complaint

| CRASH | No | FIAT 500X 2016 TURNS OFF. NO WARNING, WHILE IN MOTION |
|---|---|---|
| FIRE | No | ON A CITY STREET. MULTIPLE TIMES, LOW SPEED (20 MPH) AND HIGHER SPEED (45 MPH). DEALERSHIP TOLD ME IT WAS |
| **INJURIES** | 0 | BECAUSE I NEEDED TO CHANGE MY OIL. |
| DEATHS | 0 | |

**NHTSA ID Number:** 11329127

**Incident Date** June 14, 2020

**Consumer Location** COVINGTON, KY

**Vehicle Identification Number** 1C4PJLLB9JD****

#### Summary of Complaint

| CRASH | No | TL* THE CONTACT OWNS A 2018 JEEP CHEROKEE. THE |
|---|---|---|
| FIRE | No | CONTACT STATED THAT WHILE DRIVING 45-50 MPH, THE VEHICLE STALLED WITHOUT WARNING. AN AUDIBLE CHIME |
| **INJURIES** | 0 | WAS HEARD PRIOR TO THE FAILURE. THE CONTACT COASTED |
| DEATHS | 0 | TO THE SIDE OF THE ROADWAY AND RESTARTED THE VEHICLE. ZIMMER CHRYSLER DODGE JEEP RAM (1086 BURLINGTON PIKE, FLORENCE, KY 41042), WAS CONTACTED AND INFORMED OF THE FAILURE. THE CONTACT WAS INFORMED BY THE DEALER THAT THE VEHICLE NEEDED AN OIL CHANGE. THE VEHICLE WAS TAKEN TO AN UNKNOWN DEALER AND IT WAS CONFIRMED THAT THE VEHICLE NEEDED AN OIL CHANGE. THE CONTACT STATED THAT THE VEHICLE RECEIVED FOUR OIL CHANGES WITHIN 24 MILES. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND A CASE WAS FILED. THE FAILURE MILEAGE WAS APPROXIMATELY 24,000. |

**NHTSA ID Number:** 11309314

**Incident Date** January 23, 2020

**Consumer Location** ALTOONA, PA

**Vehicle Identification Number** ZACCJBBB9HP****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | VEHICLE HAS 14000 MILES, HAS STALLED SIX TIMES IN 13 |
| FIRE | No | MONTHS. MOST RECENTLY, DRIVING LESS THAN ONE BLOCK AWAY, MADE A RIGHT TURN INTO A PARKING LOT AND LOST |
| INJURIES | 0 | ALL POWER, DASH INSTRUCTIONS STATED THAT VEHICLE |
| DEATHS | 0 | MUST BE IN P TO SHIFT GEARS. I WAS NOT SHIFTING GEARS. |

VEHICLE HAD TO BE SHUT OFF, WOULD NOT RESTART UNTIL
ATTEMPTED THREE TIMES. THE RECALL DOES NOT INCLUDE
MY VEHICLE BUT ABSOLUTELY SHOULD AS IT IS THE EXACT
SAME ISSUE AS THE RECALLED JEEP RENEGADES. THIS IS
EXTRAORDINARILY DANGEROUS TO EVERYONE ON THE ROAD.
I HAVE TAKEN MY JEEP TO THE DEALERSHIP MULTIPLE TIMES,
THEY TELL ME THEY CAN'T FIND THE ISSUE OR THAT IT NEEDS
AN OIL CHANGE AGAIN. MY OWNER'S MANUAL STATES THAT
THE VEHICLE WILL TELL ME WHEN IT NEEDS AN OIL CHANGE,
DEALERSHIP SAYS NOT TO FOLLOW THE MANUAL, TO
CHANGE THE OIL EVERY 1,000 MILES. THIS IS THE MOST
SERIOUS OF THE ISSUES I HAVE HAD WITH THIS VEHICLE BUT
HAVE HAD NUMEROUS PARTS REPLACED IN THE FIRST YEAR
OF OWNERSHIP OF A BRAND NEW VEHICLE. PURCHASED
BRAND NEW AT $27000, NOW WORTH $14000 AND I CANNOT
EVEN DRIVE IT WITHOUT RISKING STALLING AT HIGHWAY
SPEED. IT APPEARS THAT THIS IS PRETTY SIGNIFICANT ISSUE
FOR OTHER OWNERS OF THIS VEHICLE, WHY IS NOTHING
BEING DONE? HOPEFULLY IT WON'T TAKE FATALITIES TO
WIDEN THE SCOPE OF THE RECALL OF THIS VEHICLE.

**NHTSA ID Number:** 11331626

**Incident Date** June 17, 2020

**Consumer Location** SCOTTSDALE, AZ

**Vehicle Identification Number** 3C4NJCAB4LT****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | PURCHASED A 2020 COMPASS ON MAY 28TH, 2020 WITHIN THE FIRST WEEK IT SHUT DOWN OR STALLED COMPLETELY AT A STOP STREET, HAD TO PUT THE CAR IN PARK AND HIT THE RESTART BUTTON. I WAS NOT SURE IF THIS HAD SOMETHING TO DO WITH THE AUTO STOP/START SO I SWITCHED THIS FUNCTION OFF AND IN THE FOLLOWING WEEKS IT DIED 2 MORE TIMES ONCE WHEN DRIVING THROUGH AN INTERSECTION THE NEXT TIME WHEN I WAS STARTING OFF AT A STREET LIGHT, THIS IS NOT NORMAL SO ON JUNE 26TH I RETURNED THE CAR TO THE DEALERSHIP AND FILLED A CLAIM WITH JEEP CUSTOMER SERVICE. THE SERVICE DEPARTMENT PHONED AND SAID THEY HAD THE SAME ISSUE AND IT MIGHT HAVE SOMETHING TO DO WITH FUEL. IN THE INTERIM I RESEARCHED THIS ISSUE AND THERE ARE HUNDREDS OF COMPLAINTS ON LINE FROM 2018-2020 COMPASS AND CHEROKEE LATITUDE OWNERS, ALL COMPLAINING ABOUT THE OIL CONSUMPTION, STALLING, DANGERS OF CAUSING AN ACCIDENT ETC. WHEN I PURCHASED THE CAR IT HAD 37 MILES I RETURNED IT IN LESS THAN 1 MONTH AND IT ONLY HAD 240 MILES AS WE HARDLY DROVE IT DUE TO LOCKDOWN AND WORKING FROM HOME. IF CHRYSLER/JEEP DOES NOT ACCEPT THE CAR BACK AND REFUND MY DEPOSIT I WILL HAVE A LEMON LAW LAWYER GET INVOLVED. I HAVE NO CONFIDENCE IN DRIVING THE CAR AND GET ANXIETY ATTACKS JUST THINKING ABOUT DRIVING THIS SUV AGAIN, I CANNOT HAVE IT STALL WHILE IN MOTION DUE TO THE DANGER IT POSES TO MY SAFETY AND OTHER DRIVERS SAFETY. |
| FIRE | No | |
| **INJURIES** | 0 | |
| DEATHS | 0 | |

PLEASE REVIEW THIS WITH ALL THE COMPLAINTS ON THE INTERNET. WE WERE ALWAYS DRIVING ON THE CITY STREETS WHEN THESE HAPPENED BUT IT STALLED AND WE HAD TO RESTART IT EACH TIME EVEN THE SERVICE DEPARTMENT WHO TRIED TO FIGURE IT OUT SAID IT STALLED WHEN THEY TEST DROVE IT, THIS COMPASS IS FLAWED AND DANGEROUS IT SHOULD BE TAKEN OFF THE ROAD, ESPECIALLY SINCE CHRYSLER/JEEP KNEW OF THESE PROBLEMS WITH THE COMPASS SINCE 2018, THEY ARE PUTTING PROFITS OVER SAFETY AND ACCIDENTS WILL HAPPEN AND LIVES WILL BE LOST DUE TO THE STALLING ISSUES.

25.     As the above sample of complaints made to the NHSTA demonstrate, problems associated with excessive oil consumption and the Oil Consumption Defect include, but are not limited to: unanticipated engine shutdowns, engine stalls,

engines running excessively hot, unexpected loss of power, and other problems as discussed herein. Inadequate engine oil levels resulting from the Oil Consumption Defect have the potential to cause engine fires. The failure of the vehicles' monitoring systems, including the Oil Pressure Warning Light, to warn the driver of dangerously low oil levels exacerbates the problems and dangers caused by the Oil Consumption Defect. Even Defendant's authorized dealerships are directing Class Vehicle owners not to follow the instructions in Defendant's Owner's Manuals.

26.    The Oil Consumption Defect is a substantial safety concern because it causes excessive oil consumption and associated engine failures that cannot be reasonably anticipated or predicted. The Oil Consumption Defect is unreasonably dangerous because it can cause engine failure while the vehicle is in operation at any time and under any driving conditions or speeds, thereby placing drivers, passengers, and the general public at risk of accidents and injury. In particular, the Oil Consumption Defect can result in:

    a.    Sudden engine shutoff, resulting in loss of power, loss of braking, and inability to adequately maneuver in high-speed or congested driving situations;

    b.    Driver distraction due to sudden and unexpected engine shutoff, caused by sudden loss of power, illumination of warning lights and sounds, and loss or diminution of power brake assist;

c.    Loss of maneuverability in high-speed or congested driving conditions due to unexpected loss of engine power—even when the engine does not shut off;

d.    Unexpected vehicle stalling when the vehicle comes to a stop in traffic, thereby endangering vehicle occupants by substantially increasing the risk that other vehicles will hit the Class Vehicles that have stalled unexpectedly; and

e.    Engine shutoff, failure (or seizure), or stalling that strands vehicle occupants in remote, extreme, or unsafe locations or weather conditions.

27.    Defendant is well aware of the dangers posed by engine stalling. In 2017, Defendant recalled a few hundred 2018 Jeep Compass vehicles built with cracked engine oil pump housings. In its notice to its authorized dealers, Defendant made clear: "An engine stall could cause a crash without prior warning."





10/27/2017

**New Safety Recall Advanced Communication – T6510272017**

FCA US LLC (FCA US) has announced a safety recall on certain 2018 model year (KL) Jeep® Cherokee and (MP) Jeep® Compass vehicles equipped with a 2.4L engine.

Some of the above vehicles may have been built with a cracked engine oil pump housing. The crack may propagate through the housing and cause the oil pump to fail. If the oil pump fails, it may cause the engine to stall. An engine stall could cause a crash without prior warning.

FCA US will conduct a voluntary safety recall to inspect and replace the oil pump if needed on all involved vehicles.

Dealers will be notified of the launch of this safety recall by way of established communication methods. This recall is estimated to launch in 4th Quarter of 2017.

We ask that you please take the time to ensure that your personnel are aware of this communication and are prepared to execute a customer friendly process for inquiries regarding involved vehicles.

Customer Services Field Operations
FCA US LLC

## V.    FACTUAL ALLEGATIONS WITH RESPECT TO PLAINTIFF

28.    Plaintiff purchased a new 2018 Jeep Compass (VIN: 3C4NJCAB7JT107099) at Jack Phelan Chrysler, Dodge, Jeep, and Ram, located in Countryside, Illinois, in February 2018, for approximately $23,000.

29.    As part of his purchase, Plaintiff received Defendant's Basic Limited Warranty and a copy of Defendant's Jeep Compass Owner's Manual. Defendant's

Basic Limited Warranty expressly incorporates the Owner's Manual's maintenance and servicing guidelines, stating: "Follow the instructions contained in the General and Scheduled Maintenance Service guidelines in your Owner's Manual. Regular, scheduled maintenance is essential to trouble-free operation. If there is a dispute between you and FCA US concerning your maintenance of your vehicle, FCA US will require you to provide proof that your vehicle was properly maintained. For your convenience, FCA US has prepared a Maintenance Schedule with routine service intervals which is included in your Owner's Manual. Its essential to follow these required maintenance intervals for safe trouble-free operation."

30.    Defendant's Basic Limited Warranty also informs purchasers of its vehicles that "Warranty service must be done by an authorized Chrysler, Dodge, Jeep or Ram dealer. We strongly recommend that you take your vehicle to your Selling Dealer. They know you and your vehicle best, and are most concerned that you get prompt and high quality service."

31.    Since purchasing his 2018 Jeep Compass, Plaintiff has followed FCA's recommended servicing and maintenance guidelines for his vehicle.

32.    Nonetheless, in early September 2019, while Plaintiff was driving to work in the morning, Plaintiff attempted a right turn at or about the intersection of Lawndale Avenue and 47th Street in Lyons, Illinois. Plaintiff attempted the right turn driving at a speed of less than 25 mph. Suddenly, Plaintiff's emergency brake

engaged, his engine stalled, and Plaintiff lost the ability to accelerate his vehicle. Plaintiff was forced to drift his Compass to the side of the road in order to avoid a collision.

33.    Only after his Compass's engine stalled did his vehicle's instrument panel indicate that his engine oil was critically low. While Plaintiff was able to restore his engine's power, unlock his emergency brake, and resume driving, his engine stall caused him to narrowly avoid crashing the vehicle.

34.    That same afternoon, Plaintiff's Compass stalled again without warning. His Compass's Oil Pressure Warning Light again failed to engage.

35.    Plaintiff thereafter brought his Compass to the Jack Phelan dealership on September 9, 2019, where he informed the repair technician that his vehicle had stalled without warning, requested a repair under warranty, and was informed by the technician that his engine cutoff was caused by his vehicle being 2 ½ quarts low on engine oil. The technician refilled the engine oil in Plaintiff's Compass and directed Plaintiff to return his vehicle in 1,000 miles for further testing.[2] At that point, Plaintiff's vehicle had accumulated just 23,574 miles and he had owned his Jeep Compass for less than two years, such that he was still within Defendant's Limited Warranty. Plaintiff was charged $48.00 to replenish his Compass's engine oil in order to begin the "oil consumption test."

---

[2] A copy of Plaintiff's September 9, 2019 invoice is attached as <u>Exhibit A</u>.

36.     Plaintiff returned his 2018 Jeep Compass to the Jack Phelan dealership on October 3, 2019, when his vehicle had registered 24,568 miles. Although Plaintiff's Compass had accumulated less than 1,000 miles since his last engine oil refill, he was informed that his Compass had burned through another 2 quarts of oil, and he was directed to return in another 1,000 miles.[3] His Compass was burning through a quart of oil approximately every 500 miles.

37.     Within a mere 994 miles, Plaintiff's engine oil had descended below the threshold Defendant designates as safe, rendering his vehicle at risk of sudden engine stalling without warning. Exacerbating the danger is the fact that Plaintiff's Oil Pressure Warning Light and other engine oil monitors fail to engage prior to engine stalling and vehicle inoperability.

38.     Plaintiff returned his 2018 Jeep Compass to the Jack Phelan dealership a third time, on November 21, 2019, after his vehicle had registered 26,535 miles. The dealership determined that his engine oil levels were low, but again failed to provide any long-term repair and merely directed Plaintiff to return again in another 1,000 miles.[4]

39.     Plaintiff returned his 2018 Jeep Compass to the Jack Phelan dealership a fourth time, on December 12, 2019, after his vehicle had registered 27,541 miles.

---

[3] A copy of Plaintiff's October 3, 2019 invoice is attached as Exhibit B.

[4] A copy of Plaintiff's November 21, 2019 invoice is attached as Exhibit C.

Defendant's authorized dealership again determined his vehicle's oil engine levels were problematic, but failed, for the fourth time, to provide any actual repair for the Oil Consumption Defect.[5]

40.    Plaintiff returned his 2018 Jeep Compass to the Jack Phelan dealership for a fifth time, on January 7, 2020, after his vehicle had registered 28,556 miles, for yet another test. Defendant's authorized dealership again confirmed Plaintiff's engine had burned nearly a quart of oil in 1,000 miles, but failed to provide a repair.[6]

41.    Only upon Plaintiff's *sixth* attempt to obtain a repair did Defendant authorize an engine replacement. On February 4, 2020, six months after Plaintiff first complained about the Oil Consumption Defect, Defendant's authorized dealership acknowledged that Plaintiff's 2.4L Tigershark engine had suffered damage from the Oil Consumption Defect and may require replacement.[7]

42.    On February 13, 2020, Plaintiff had his engine replaced. Because of reports that replacement engines have continued to exhibit the Oil Consumption Defect, Plaintiff has been forced to expend time, money, and effort in monitoring his engine's oil levels with increased frequency and accounting for the risks of engine stalling.

---

[5] A copy of Plaintiff's December 12, 2019 invoice is attached as <u>Exhibit D</u>.

[6] A copy of Plaintiff's January 7, 2020 invoice is attached as <u>Exhibit E</u>.

[7] A copy of Plaintiff's February 4, 2020 invoice is attached as <u>Exhibit F</u>.

43.     As a result of the Oil Consumption Defect, Plaintiff has been forced to expend time, money, and effort continuously refilling his engine oil, account for the risk of engine stalling, and would not have purchased a 2018 Jeep Compass had he known that its 2.4L Tigershark engine consumed engine oil at such excessive intervals, would ultimately fail and require replacement, and lead to a decreased resale value in his vehicle. In light of reports that excessive oil consumption continues to afflict Defendant's replacement engines, Plaintiff continues to account for the risks of engine stalling during the normal use of his vehicle.

## VI.    CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff brings this action individually and on behalf of all similarly situated persons as the Court may determine to be appropriate for class certification treatment, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b). Plaintiff seeks to represent the following Class and Subclass of Class Vehicle purchasers:

The Nationwide Class: All individuals who, within the applicable limitations period, purchased or leased a Class Vehicle in the United States or its Territories.

The Illinois Subclass: All individuals who, within the applicable limitations period, purchased or leased a Class Vehicle in the state of Illinois.

45.     Excluded from the Nationwide Class (the "Class") and the Illinois Subclass (the "Subclass") are Defendant, Defendant's officers and directors, those

persons' immediate families, and the successors and predecessors of any such excluded person or entity.

46. Defendant manufactured thousands of vehicles containing the Oil Consumption Defect during the relevant time period, and the Class is reasonably estimated to be in the thousands or tens of thousands such that joinder of all their members is impracticable. The precise number of members of the Class and Subclass is unknown to Plaintiff, but can be ascertained through Defendant's records.

47. There is a well-defined community of interest in the relevant questions of law and fact affecting the putative members of the Class and Subclass.

48. Common questions of law and fact predominate over any individual questions affecting the members of the Class and Subclass, including, but not limited to, the following:

    a.    Whether the Class Vehicles and their engines are defectively designed or manufactured such that they are not suitable for their intended use;

    b.    Whether Defendant misrepresented to Plaintiff and the Class and Subclass members the oil change intervals necessary for the Class Vehicles to perform safely;

    c.    Whether the fact that the Class Vehicles suffer from the Oil Consumption Defect would be considered material to a reasonable consumer;

d.      Whether, as a result of Defendant's concealment or failure to disclose material facts, Plaintiff and the Class and Subclass members acted to their detriment by purchasing Class Vehicles manufactured by Defendant;

e.      Whether Defendant was aware of the Oil Consumption Defect prior to selling the Class Vehicles;

f.      Whether the Oil Consumption Defect constitutes an unreasonable safety risk;

g.      Whether Defendant breached express warranties with respect to the Class Vehicles;

h.      Whether Defendant breached implied warranties with respect to the Class Vehicles;

i.      Whether Defendant had a duty to disclose the defective nature of the Class Vehicles and the Oil Consumption Defect to Plaintiff and the Class and Subclass members;

j.      Whether Plaintiff and the Class and Subclass members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

k.      Whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act when it sold to consumers Class Vehicles that suffered from the Oil Consumption Defect; and

l.      Whether Defendant has acted with deliberate indifference to the safety risks posed by the Oil Consumption Defect.

49.    With respect to the putative Class and Subclass, Plaintiff's claims are typical of those of the absent members of the Class and Subclass. If brought and prosecuted individually, the claims of each member of the Class and Subclass would require proof of many of the same material and substantive facts and would rely upon the same remedial theories, seeking the same relief.

50.    Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and Subclass. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and Subclass, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class or Subclass.

51.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by individual members of the Class and Subclass would create a risk of inconsistent or varying adjudications, which would establish

incompatible standards of conduct for the parties opposing the Class and Subclass. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof, and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class and Subclass.

52.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), in that common questions of law and fact predominate over any questions affecting only individual members of the Class and Subclass.

53.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

a.     Individual claims by the members of the Class and Subclass would be impracticable, as the costs of pursuing such claims individually would exceed what any one Class or Subclass member has at stake;

b.     Individual members of the Class and Subclass are unlikely to have an interest in separately prosecuting and controlling any individual actions;

c.     The concentration of litigation of these common claims in one forum will achieve efficiency and promote judicial economy; and

d.     The proposed class action is manageable.

## COUNT I

## BREACH OF WRITTEN WARRANTIES UNDER THE MAGNUSON-MOSS WARRANTY ACT,
## 15 U.S.C. § 2301, *ET SEQ.*
### (On Behalf Of Plaintiff And The Proposed Class And Subclass)

54.     Plaintiff realleges the foregoing allegations as if fully set forth herein.

55.     Plaintiff and the other Class members are "consumers" within the meaning of 15 U.S.C. § 2310(3).

56.     Defendant is a "supplier" and "warrantor" within the meanings of sections 15 U.S.C. § 2301(4)–(5).

57.     The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

58.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with any written warranty.

59.     In connection with the sale of every Class Vehicle, Defendant warranted that its authorized dealerships would ***promptly*** repair any item contained in the Class Vehicles that is defective in material, workmanship, and/or factory preparation.

60.     However, with regards to the Oil Consumption Defect, Defendant has refused to provide warranty repairs promptly. Instead, as discussed herein, Defendant forces Class Vehicle owners to undergo extended "oil consumption tests" over a period of months or longer with no clear resolution. For instance, Defendant

has required that Plaintiff return his vehicle for an oil consumption check *six times*, over a period of six months, before offering any material repair. With regards to the Class Vehicles' defective oil pressure and oil level monitoring systems, Defendant has offered no remedy at all.

61.     Accordingly, Defendant's Basic Limited Warranty is deceptive because it fails to accurately state what Defendant will do in the event of a defect, as required by 16 C.F.R. § 701.3(a)(3).

62.     It was a basis of the bargain between Plaintiff and the Class members that Defendant would promptly provide warranty repairs, such that as a result of Defendant's deception, Plaintiff and the Class members have overpaid for their Class Vehicles.

63.     Further, Defendant's statements concerning the Class Vehicles' engine oil consumption and operation of the Class Vehicles' engine oil monitoring systems made in its Basic Limited Warranty and in its Owner's Manual are each a "written warranty" within the meaning of 15 U.S.C. § 2301(6), because they are written affirmations of fact that certain Class Vehicle components are defect free and/or will meet a specified level of performance over a specified time period.

64.     In fact, Defendant's Basic Limited Warranty covering the Class Vehicles expressly incorporates Defendant's Owner's Manual by making warranty repair contingent upon compliance with the Owner's Manual's directions.

- 37 -

Defendant's Basic Limited Warranty states "Follow the instructions contained in the General and Scheduled Maintenance Service guidelines in your Owner's Manual. Regular, scheduled maintenance is essential to trouble-free operation" and "For your convenience, FCA US has prepared a Maintenance Schedule with routine service intervals which is included in your Owner's Manual. It's essential to follow these required maintenance intervals for safe trouble-free operation."

65. Defendant's Owner's Manual makes the following written warranties concerning materials and/or workmanship present in the Class Vehicles:

a. "OIL PRESSURE WARNING LIGHT: This warning light will illuminate to indicate low engine oil pressure. If the light turns on while driving, stop the vehicle and shut off the engine as soon as possible. A chime will sound when this light turns on";

b. "Your vehicle is equipped with an engine oil change indicator system. The 'Oil Change Due' message will display in the instrument cluster display for five seconds after a single chime has sounded, to indicate the next scheduled oil change interval";

c. "Your vehicle is equipped with an automatic change indicator system. The oil change indicator system will remind you that it is time to take your vehicle in for scheduled maintenance";

- 38 -

d.      "Severe Operation Conditions can cause the change oil message to illuminate as early as 3,500 miles (5,600 km) since last reset. Have your vehicle serviced as soon as possible, within the next 500 miles (805 km)";

e.      "Under no circumstances should oil change intervals exceed 10,000 miles (16,000 km), one year or 350 hours of engine run time, whichever comes first";

f.      "Change Engine Oil at 4,000 miles (6,500 km) or 350 hours engine run time if the vehicle is operated in a dusty and off road environment or is operated predominately at idle or only very low engine RPMs";

g.      "Check the oil level at regular intervals, such as once a month or before a long trip"; and

h.      "Oil changes should be consistent with anticipated climate conditions under which vehicle operations will occur".

66.     Defendant breached each of these written warranties by:

a.      Selling and leasing Class Vehicles containing the Oil Consumption Defect, which requires Plaintiff and the Class and Subclass members to replenish their vehicle's engine oil at much less than 3,500-mile intervals, the limit applicable to Severe Operation Conditions;

- 39 -

b.      Selling and leasing Class Vehicles containing Oil Pressure Warning Lights that, due to the Oil Consumption Defect, fail to engage before the Class Vehicles' engine stalls and/or shuts down due to low engine oil levels, and otherwise fail to warn Class Vehicle owners of critically low engine oil levels;

c.      Selling and leasing Class Vehicles containing the Oil Consumption Defect, such that its Class Vehicles are incapable of reaching even a tenth of the warranted maximum oil-change interval of 10,000 miles, one year, or 350 hours of engine run time;

d.      Selling and leasing Class Vehicles containing the Oil Consumption Defect, which causes the Class Vehicles' "engine oil change indicator system" to fail to engage when oil levels are dangerously low; and

e.      Selling and leasing Class Vehicles containing the Oil Consumption Defect, such that owners of the Class Vehicles must monitor their oil levels constantly, and replenish their engine oil more than once per month and without regard to climate conditions in order to prevent involuntary engine stalling and vehicle inoperability.

67.     Defendant's breaches of its written warranties have deprived Plaintiff and the Class members of the benefit of their bargain. When they purchased their Class Vehicles, Plaintiff and the Class members understood Defendant's statements

in its Owner's Manual to be accurate descriptions of the Class Vehicles' components and operational requirements.

68.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 computed on the basis of all claims to be determined in this suit, and there are over 100 class members.

69.    Defendant has been afforded a reasonable opportunity to cure its breaches of written warranties, including when Plaintiff and Class members brought their vehicles in for diagnostics, complained about the effects of the Oil Consumption Defect, and to warn Defendant of the dangers posed to them and the public by the effects of the Oil Consumption Defect. The volume and content of the complaints received by Defendant put it on notice of a defect in the Class Vehicles obligating Defendant to provide warranty repairs.

70.    Additionally, Defendant has had actual knowledge of the Oil Consumption Defect and that the 2.4L Tigershark engines installed in the Class Vehicles consume excessive engine oil since, at the latest, 2015. Defendant received actual knowledge of Plaintiff's warranty claim when he brought his Class Vehicle to Defendant's authorized dealership on September 9, 2019, because the dealership notified Defendant of Plaintiff's excessive oil consumption complaint.

71.     As a direct and proximate result of Defendant's breach of the foregoing written warranties, Plaintiff and the Class members sustained damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiff and the Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorneys' fees, and/or other relief as appropriate.

## COUNT II

### BREACH OF IMPLIED WARRANTIES UNDER THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *ET SEQ.*
### (On Behalf Of Plaintiff And The Proposed Class And Subclass)

72.     Plaintiff realleges the foregoing allegations as if fully set forth herein.

73.     Plaintiff and the other Class members are "consumers" within the meaning of 15 U.S.C. § 2310(3).

74.     Defendant is a "supplier" and "warrantor" within the meanings of sections 15 U.S.C. § 2301(4)–(5).

75.     The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

76.     15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with any implied warranty.

77.     Plaintiff, as well as the other Class members, contracted with Defendant, through Defendant's authorized dealership agents, to purchase Class

Vehicles, and paid significant consideration in the form of the purchase price for the Class Vehicles. Defendant represents that its authorized dealerships act on its behalf with regards to the Class Vehicles. For instance, Defendant's warranty booklet tells Class Vehicle purchasers: "FCA recommends that you return to the authorized dealer from whom you bought your vehicle for all maintenance service both during and after the warranty periods." Defendant controls its authorized dealerships' warranty repair protocols, as it provides the training, materials, special tools, replacement parts necessary to perform repairs, and requires that warranty repairs be performed at Defendant's direction.

78.    In purchasing their Class Vehicles, Plaintiff and the other Class and Subclass members dealt with Defendant directly, as Defendant authored the directions and representations in its Class Vehicle Owner's Manuals and Defendant provided the express warranties applicable to Plaintiff and the Class and Subclass members.

79.    Defendant's statements and representations concerning the Class Vehicles' engine oil consumption made in Defendant's marketing materials and Owner's Manual were directed specifically to Class Vehicle purchasers, including Plaintiff and the Class and Subclass Members

80.    Plaintiff and the Class members directly relied on Defendant's warranties, representations, statements, and omissions concerning the Class Vehicles' engine oil consumption when choosing to purchase their Class Vehicles.

81.    As a matter of law, each Class Vehicle comes with an implied warranty of merchantability whereby each vehicle is warranted by Defendant to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which it was to be used.

82.    However, Defendant breached this implied warranty of merchantability, as the Class Vehicles are not fit for the ordinary purposes for which they are to be used and would not pass without objection within the trade, because at the time they left Defendant's control, they contained the Oil Consumption Defect, which unreasonably inhibits engine function, inhibits the Class Vehicles' engine oil monitoring mechanisms, and renders the vehicles prone to stalling without warning, endangering the Class Vehicles' owners as well as the general public.

83.    Defendant's breach of warranty deprived Plaintiff and the other Class members of the benefit of their bargain because the Oil Consumption Defect renders their vehicles undrivable, unsafe, forces Plaintiff and the other Class members to constantly monitor their engine oil levels, and requires them to seek vehicle servicing with abnormal frequency.

84.    Defendant has been afforded a reasonable opportunity to cure its breaches of implied warranties, including when Plaintiff and Class members brought their vehicles in for diagnostics, to complain about the effects of the Oil Consumption Defect, and to warn Defendant of the dangers posed to them and the public by the effects of the Oil Consumption Defect.

85.    Additionally, Defendant has had actual notice of the Oil Consumption Defect and that the engines installed in the Class Vehicles consume excessive engine oil since, at the latest, 2015. Defendant received actual knowledge of Plaintiff's warranty claim when he brought his Class Vehicle to Defendant's authorized dealership on September 9, 2019, because the dealership notified Defendant of Plaintiff's excessive oil consumption complaint.

86.    As a proximate and foreseeable result of Defendant's breach, Plaintiff and the other Class members have and/or will sustain damages and loss. These damages include, but are not limited to: the loss of value of their Class Vehicles as a result of the Oil Consumption Defect; expectation damages for Plaintiff and the Class members because they did not obtain the benefit of the bargain they struck with Defendant; loss of time, money, and use of their Class Vehicles due to the need for constant servicing; and any further damages that Plaintiff and the other Class members have or will incur in order to remedy the Oil Consumption Defect.

## COUNT III

## BREACH OF EXPRESS WARRANTIES
### (On Behalf Of Plaintiff And The Proposed Class And Subclass)

87.     Plaintiff realleges the foregoing allegations as if fully set forth herein.

88.     At the time of his purchase of his Class Vehicle, Plaintiff received certain express warranties from Defendant, including express warranties featured in Defendant's Basic Limited Warranty and Owner's Manual.

89.     In connection with the sale of every Class Vehicle, Defendant warranted that its authorized dealerships would *promptly* repair any item contained in the Class Vehicles that is defective in material, workmanship, and/or factory preparation.

90.     However, with regards to the Oil Consumption Defect, Defendant has refused to provide warranty repairs promptly. Instead, as discussed herein, Defendant forces Class Vehicle owners to undergo extended "oil consumption tests" over a period of months or longer with no clear resolution. For instance, Defendant has required that Plaintiff return his vehicle for an oil consumption check *six times*, over a period of six months, before offering any material repair. With regards to the Class Vehicles' defective oil pressure and oil level monitoring systems, Defendant has offered no remedy at all.

91.     Additionally, in its Basic Limited Warranty covering the Class Vehicles, Defendant explicitly states "Follow the instructions contained in the

General and Scheduled Maintenance Service guidelines in your Owner's Manual. Regular, scheduled maintenance is essential to trouble-free operation." Accordingly, these maintenance instructions and directions became a basis of the bargain between Defendant, on the one hand, and Plaintiff and the Class and Subclass members, on the other. However, as discussed herein, following Defendant's recommended maintenance and servicing schedule results in inadequate engine oil levels and leads to engine stalling and loss of vehicle control.

92.   Further, Defendant's Owner's Manual provides the following affirmations of fact relating to the Class Vehicles' components and the Class Vehicle's performance:

a.   "OIL PRESSURE WARNING LIGHT: This warning light will illuminate to indicate low engine oil pressure. If the light turns on while driving, stop the vehicle and shut off the engine as soon as possible. A chime will sound when this light turns on";

b.   "Your vehicle is equipped with an engine oil change indicator system. The 'Oil Change Due' message will display in the instrument cluster display for five seconds after a single chime has sounded, to indicate the next scheduled oil change interval";

c.      "Your vehicle is equipped with an automatic change indicator system. The oil change indicator system will remind you that it is time to take your vehicle in for scheduled maintenance";

d.      "Severe Operation Conditions can cause the change oil message to illuminate as early as 3,500 miles (5,600 km) since last reset. Have your vehicle serviced as soon as possible, within the next 500 miles (805 km)";

e.      "Under no circumstances should oil change intervals exceed 10,000 miles (16,000 km), one year or 350 hours of engine run time, whichever comes first";

f.      "Change Engine Oil at 4,000 miles (6,500 km) or 350 hours engine run time if the vehicle is operated in a dusty and off road environment or is operated predominately at idle or only very low engine RPMs";

g.      "Check the oil level at regular intervals, such as once a month or before a long trip"; and

h.      "Oil changes should be consistent with anticipated climate conditions under which vehicle operations will occur".

93.     Defendant breached each of these express warranties by:

a.      Selling and leasing Class Vehicles containing the Oil Consumption Defect, requiring Plaintiff and the Class and Subclass members to

replenish their vehicle's engine oil at much less than 3,500-mile intervals, the limit applicable to Sever Operation Conditions;

b.    Selling and leasing Class Vehicles containing the Oil Consumption Defect, such that its Class Vehicles are incapable of reaching even half of the maximum oil-change interval of 10,000 miles, one year, or 350 hours of engine run time;

c.    Selling and leasing Class Vehicles containing the Oil Consumption Defect, which causes the Class Vehicles' Oil Pressure Indicator Lights to fail to alert Class Vehicle drivers prior to engine stalling due to low engine oil levels;

d.    Selling and leasing Class Vehicles containing the Oil Consumption Defect, which causes the Class Vehicles' Engine Oil Change Indicator System to fail to engage when oil levels are dangerously low; and

e.    Selling and leasing Class Vehicles containing the Oil Consumption Defect, such that owners of the Class Vehicles must monitor their oil levels constantly, and replenish their engine oil more than once per month and without regard to climate conditions in order to prevent involuntary engine stalling and vehicle inoperability.

94.    Defendant's breaches of its express warranties have deprived Plaintiff and the Class and Subclass members of the benefit of their bargain. When they

purchased their Class Vehicles, Plaintiff and the Class members understood Defendant's statements in its Owner's Manual to be accurate descriptions of the Class Vehicles' components and operational requirements.

95.    Despite its knowledge of the Oil Consumption Defect, Defendant has failed to honor its express warranties, failed to conform the Class Vehicles to its express warranties, and has failed to adequately repair the defects in Plaintiff's vehicle or in the Class Vehicles of the other Class and Subclass members.

96.    Defendant has been afforded a reasonable opportunity to cure its breaches of written warranties, including when Plaintiff and the Class and Subclass members brought their vehicles in for diagnostics, to complain about the effects of the Oil Consumption Defect, and to warn Defendant of the dangers posed to them and the public by the effects of the Oil Consumption Defect. The volume and content of the complaints received by Defendant put it on notice of a defect in the Class Vehicles obligating Defendant to provide warranty repairs

97.    Defendant has had actual notice of the Oil Consumption Defect and that the 2.4L Tigershark engines installed in the Class Vehicles consume excessive engine oil since, at the latest, 2015. Defendant received actual knowledge of Plaintiff's warranty claim when he brought his Class Vehicle to Defendant's authorized dealership on September 9, 2019, because the dealership notified Defendant of Plaintiff's excessive oil consumption complaint.

98.    As a direct and proximate result of Defendant's breach of the foregoing written warranties, Plaintiff and the Class and Subclass members sustained damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiff and the Class and Subclass members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs and/or other relief as appropriate.

## COUNT IV

## BREACH OF IMPLIED WARRANTY
### (On Behalf Of Plaintiff And The Proposed Class And Subclass)

99.    Plaintiff realleges the foregoing allegations as if fully set forth herein.

100.    Plaintiff, as well as the other Class members, contracted with Defendant, through Defendant's authorized dealership agents, to purchase Class Vehicles, and paid significant consideration in the form of the purchase price for the Class Vehicles. Defendant expressly represents that its authorized dealerships act on its behalf with regards to completing warranty repairs and addressing any problems with the Class Vehicles. For instance, Defendant's warranty booklet tells Class Vehicle purchasers: "FCA recommends that you return to the authorized dealer from whom you bought your vehicle for all maintenance service both during and after the warranty periods." Defendant controls its authorized dealerships' warranty repair protocols, as it provides the training, materials, special tools, and replacement parts, and requires that repairs be performed at Defendant's direction.

101.   With regards to their Class Vehicle purchases, Plaintiff and the other Class and Subclass members dealt with Defendant directly, because Defendant authored the directions and representations in its Owner's Manuals and because Defendant provided express warranties to Plaintiff and the Class and Subclass members.

102.   Defendant's statements and representations concerning the Class Vehicle's engine oil consumption made in Defendant's marketing materials, Owner's Manual, and other communications were directed specifically to Class Vehicle owners, including Plaintiff and the Class and Subclass Members.

103.   Plaintiff and the Class and Subclass members directly relied on Defendant's representations, statements, and omissions concerning the Class Vehicles' engine oil consumption when choosing to purchase their Class Vehicles.

104.   As a matter of law, each Class Vehicle comes with an implied warranty of merchantability whereby each vehicle is warranted by Defendant to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which it was to be used.

105.   However, Defendant breached this implied warranty of merchantability, as the Class Vehicles are not fit for the ordinary purposes for which they are to be used and would not pass without objection with the trade, because at the time they left Defendant's control, they contained the Oil Consumption Defect,

which inhibits engine function, inhibits the Class Vehicles' low engine oil alert mechanisms, and renders the vehicles prone to stalling without warning, endangering the Class Vehicles' owners as well as the general public.

106. Defendant's breach of warranty deprived Plaintiff and the other members of the Class and Subclass the benefit of their bargain because the Oil Consumption Defect renders their vehicles unsafe to drive, forces them to constantly monitor their engine oil levels, and requires them to seek vehicle servicing with abnormal frequency.

107. Defendant has been afforded a reasonable opportunity to cure its breaches of implied warranties, including when Plaintiff and Class and Subclass members brought their vehicles in for diagnostics, to complain about the effects of the Oil Consumption Defect, and to warn Defendant of the dangers posed to them and the public by the effects of the Oil Consumption Defect.

108. Additionally, Defendant has had actual notice of the Oil Consumption Defect and that the engines installed in the Class Vehicles consume excessive engine oil since, at the latest, 2015. Defendant received actual knowledge of Plaintiff's warranty claim when he brought his Class Vehicle to Defendant's authorized dealership on September 9, 2019, because the dealership notified Defendant of Plaintiff's excessive oil consumption complaint.

109.    As a proximate and foreseeable result of Defendant's breach, Plaintiff and the other members of the Class and Subclass have and/or will sustain damages and loss. These damages include, but are not limited to: the loss of value of their Class Vehicles as a result of the Oil Consumption Defect; expectation damages for Plaintiff and the members of the Class and Subclass because they did not obtain the benefit of the bargain they struck with Defendant; loss of time, money, and use of their Class Vehicles due to the need for constant servicing; and any further damages that Plaintiff and the other members of the Class and Subclass members have or will incur in order to remedy the Oil Consumption Defect.

## COUNT V

### FRAUDULENT CONCEALMENT
### (On Behalf Of Plaintiff And The Proposed Class And Subclass)

110.    Plaintiff realleges the foregoing allegations as if fully set forth herein.

111.    In connection with the sale of the Class Vehicles, Defendant intentionally concealed the material fact that the Class Vehicles contained 2.4L Tigershark engines which consume engine oil at an abnormal, faster rate than consumer automobile engines, require oil changes much more frequently than it represents in its Owner's Manual, and will stall without warning. Defendant has known since 2015, at the latest, that the Class Vehicles' 2.4L Tigershark engines require oil replenishment much more frequently than is normal in consumer automobiles, and knew, from the volume of complaints to its authorized dealerships

or Defendant directly, prior to Plaintiff's purchase that the 2.4L Tigershark engine had a propensity to stall, causing Class Vehicles to lose power.

112.    Defendant concealed this fact from Plaintiff and the Class Members, and, indeed, marketed its 2.4L Tigershark engine as uniquely efficient, in order to induce a false belief in Plaintiff and the Class members that the Class Vehicles consumed engine oil at a normal, industry-standard rate. Defendant had a duty to disclose to Plaintiff and the Class and Subclass members that its 2.4L Tigershark engine consumed excessive engine oil because it had superior and special knowledge of the 2.4L Tigershark engine's capabilities, as evidenced by Technical Service Bulletin 09-007-15 referenced above, as well as exclusive data from pre-sale testing and consumer complaints regarding the 2.4L Tigershark engine made prior to the sale of the Class Vehicles. Defendant also had a duty to inform Plaintiff and the Class and Subclass members of the Oil Consumption Defect under the circumstances because of the particular dangers involved with excessive oil consumption described herein, including sudden vehicle stalling without warning and the resulting risk of collision.

113.    Plaintiffs relied on Defendant's reputation as an automaker, along with Defendant's omission of the defects in the Class Vehicles and affirmative statements that its vehicles were safe and reliable, when they purchased or leased the Class Vehicles.

- 55 -

114.   Plaintiff and the Class and the Subclass members could not reasonably have discovered that the Class Vehicles require excessive engine oil refilling prior to purchasing their Class Vehicles. Thus, when purchasing their Class Vehicles they justifiably believed that the Class Vehicles would consume engine oil efficiently or at least would not require engine oil replacement at less than 3,000-mile intervals.

115.   Had Plaintiff and the Class members known that the Class Vehicles contained engines prone to excessive oil consumption which caused dangerous engine stalling, loss of vehicle control, and excessive servicing visits, Plaintiff and the Class members would not have purchased the Class Vehicles or would have paid substantially less for them.

116.   As a proximate and foreseeable result of Defendant's conduct, Plaintiff and the Class members have suffered actual damages and other loss in amounts to be proven at trial, including paying excessive amounts for the Class Vehicles, physical damage to their vehicles, monetary losses associated with the decreased value of their vehicles, monetary losses associated with the cost of having to repeatedly return their vehicles for servicing, and the future costs of abnormal amounts of engine oil replenishment.

## COUNT VI

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/2
### (On Behalf Of Plaintiff And The Proposed Subclass)

117.   Plaintiff realleges the foregoing allegations as if fully set forth herein.

118.   Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides in relevant part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

119.   Plaintiff and the members of the Subclass are "consumers" within the meaning of Section 1(e) of the ICFA.

120.   Defendant's conduct as alleged herein occurred in the course of trade or commerce.

121.   In manufacturing, selling, and designing the Class Vehicles, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendant

engaged in unfair or deceptive acts or practices prohibited by the ICFA, including, but not limited to:

a.    By representing in its Basic Limited Warranty that Defendant or Defendant's agents would provide warranty repairs promptly. In reality, with regards to the Oil Consumption Defect, Defendant has refused to provide any actual repair and instead has forced Plaintiff and other Subclass members to return repeatedly for further "testing," even though such testing reveals a recurring oil consumption defect;

b.    By representing in its marketing materials that the Class Vehicles' 2.4L Tigershark engines contain efficient systems, control oil flow precisely, and result in a "quiet and refined ride." In reality the Class Vehicles are equipped with engines that do not control oil flow precisely or efficiently, and, due to uncontrolled stalling and operational interruption, do not result in a quiet or comfortable ride;

c.    By representing in its Owner's Manual and other materials that its Class Vehicles would require oil changes at intervals exceeding 3,500 miles unless the vehicle was being operated under unusual circumstances, and that Class Vehicle owners would only need to check engine oil levels at "regular intervals." In reality, Plaintiff and the Subclass members must check their Class Vehicles' engine oil levels constantly and

- 58 -

replace their engine oil at less than 1,000-mile intervals just to avoid involuntary engine stalling, engine damage, and related catastrophic injury risk;

d.     By representing in its Owner's Manual and other materials that "Oil changes should be consistent with anticipated climate conditions under which vehicle operations will occur." In reality, Defendant's Class Vehicles require excessive oil changes without regard to climate conditions, and require excessive engine oil replenishment due to the Oil Consumption Defect;

e.     By representing in its Owner's Manual and other materials that the Class Vehicles came equipped with a functional Oil Pressure Warning Light which would "illuminate to indicate low oil pressure." In reality, due to the Oil Consumption Defect, the Class Vehicles' Oil Pressure Warning Lights fail to illuminate prior to engine stalling due to low engine oil levels;

f.     By representing in its Owner's Manual and other materials that that the Class Vehicles contained an "engine oil change indicator system" that would warn Class Vehicle owners when engine oil levels were critically low. In reality, the Class Vehicles' engine oil change indicator systems do not warn Plaintiff and the Subclass members when their Class

Vehicles' engine oil levels are critically low, subjecting Plaintiff and the Subclass members to involuntary engine stalling, engine damage, and related catastrophic injury risks; and

g.    By failing to disclose to, and concealing from, Plaintiff and the Subclass members that the Class Vehicles contain the Oil Consumption Defect and 2.4L Tigershark engines that Defendant knows consume engine oil abnormally, while at the same representing that the Class Vehicles may be safely operated with standard engine oil change intervals.

122.    By including such false representations and omissions in its marketing materials and Owner's Manual provided at the time of sale, as well as other direct communications to Class Vehicle owners and prospective purchasers, Defendant intended that the Class Vehicle purchasers, such as Plaintiff and the Subclass members, rely on such representations and omissions.

123.    Plaintiff and the Subclass members understood the representations in Defendant's Owner's Manual to accurately describe the Class Vehicles' components and operational requirements.

124.    Absent Defendant's misrepresentations and omissions, and had Plaintiff and the Subclass members been adequately informed of the Oil Consumption Defect, they would not have purchased Defendant's Class Vehicles or would have paid significantly less for them. Had Plaintiff and the Subclass members

known that the Class Vehicles' oil monitoring components would not engage prior to engine stalling, they would have taken remedial safety measures to protect themselves and their Class Vehicles from damage. Had Plaintiff and the Subclass members known that Defendant would not provide warranty repairs promptly, and would instead provide over months of ineffective "testing," they would not have paid the prices they did for the Class Vehicles, which factored in Defendant's deceptive warranty.

125.  Plaintiff and the Subclass members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose, because Defendant had exclusive knowledge of the information surrounding the Oil Consumption Defect and did not alert Plaintiff and the Subclass members to such information prior to their purchase of their Class Vehicles.

126.  Defendant intentionally misrepresented, and concealed, material facts concerning the Oil Consumption Defect from Plaintiff and the Subclass members in an effort to induce Plaintiff and the Subclass members to purchase the Class Vehicles and to purchase the Class Vehicles at a higher price than Plaintiff and the Subclass members would have otherwise paid had the defect been properly and appropriately disclosed.

127.   Further, Defendant's false and misleading representations, material omissions, and refusal to remedy the Oil Consumption Defect are each contrary to public policy, immoral, unethical, oppressive, unscrupulous, and cause substantial injury to consumers by exposing Class Vehicle Owners and the general public to the dangers of involuntary engine stalling without warning, catastrophic collision risks. As described herein, Defendant is well aware of the dangers of engine stalling without warning, and was well aware of its 2.4L Tigershark engines' propensity to consume engine oil at an abnormal rate prior to selling the Class Vehicles, but has refused to provide adequate remedies to Class Vehicle owners.

128.   Because Defendant has refused to immediately remedy the Oil Consumption Defect, and instead only directed Plaintiff and the Subclass members to repeatedly bring their Class Vehicles to one of Defendant's authorized dealerships for ineffective "testing," Plaintiff and the Subclass members were left with little choice except to continue driving vehicles which could stall and brake involuntarily at any time without warning.

129.   Though Defendant is aware of the Oil Consumption Defect, and aware of its associated dangers, Defendant has acted with deliberate indifference by failing to take any material step to prevent the catastrophic injury risks posed to Class Vehicle owners and the general public.

130.    Defendant's scheme and concealment of the true characteristics of the Oil Consumption Defect were material to Plaintiff and the Subclass members, as Defendant intended.

131.    As a direct and proximate result of Defendant's deceptive and unfair trade practices, Plaintiff and the other Subclass members suffered actual damages, including paying excessive amounts for the Class Vehicles, damage to their vehicles, monetary losses associated with the decreased value of their vehicles due to repairs, monetary losses associated with the cost of having to repeatedly return their vehicles for engine oil replenishment, the unreasonable cost of abnormal engine oil replenishment, and expectation damages associated with not receiving the benefit of their bargains with Defendant.

132.    Defendant's conduct is in violation of the ICFA, and pursuant to 815 ILCS 505/10a, Plaintiff and the Subclass members are entitled to damages in an amount to be proven at trial, reasonable attorneys' fees, injunctive relief prohibiting Defendant's unfair and deceptive conduct going forward, and any other penalties or awards that may be appropriate under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiff, individually and on behalf of similarly situated individuals, requests relief and judgment against Defendant as follows:

A.      An Order certifying the Class and Subclass as defined above;

B.      An award of actual and compensatory damages to Plaintiff and the other members of the Class and Subclass for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

C.      An award of punitive damages for Defendant's misconduct and deliberate indifference to catastrophic injury risks;

D.      An award of reasonable attorneys' fees and costs;

E.      An Order enjoining Defendant from continuing to sell vehicles containing the Oil Consumption Defect without disclosing the Class Vehicles' excessive engine oil consumption; and

F.      Such further and other relief as the Court deems reasonable and just.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all claims and issues so triable.

- 64 -

Dated: July 21, 2020                    Respectfully submitted,

                                        HAGENS BERMAN SOBOL SHAPIRO
                                        LLP

                                         *s/ Steve W. Berman*
                                        Steve W. Berman
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
                                        Seattle, WA 98101
                                        Telephone: (206) 623-7292
                                        Facsimile:  (206) 623-0594
                                        steve@hbsslaw.com


                                        E. Powell Miller (P39487)
                                        THE MILLER LAW FIRM PC
                                        950 W. University Dr., Ste. 300
                                        Rochester, MI 48307
                                        Telephone: (248) 841-2200
                                        Facsimile:  (248) 652-2852
                                        epm@millerlawpc.com


                                        Myles McGuire
                                        Evan M. Meyers
                                        Timothy P. Kingsbury
                                        MCGUIRE LAW, P.C.
                                        55 W. Wacker Dr., 9th Fl.
                                        Chicago, Illinois 60601
                                        Tel: (312) 893-7002
                                        mmcguire@mcgpc.com
                                        emeyers@mcgpc.com
                                        tkingsbury@mcgpc.com

                                        *Attorneys for Plaintiff and the Putative Class*